May it please the Court, Matt Powa for the appellant, Greenpeace, Inc., which I will be referring to as Greenpeace USA, Your Honors. With me at council table is Laura Brill, my co-counsel, and if it please the Court, I would like to reserve three minutes of rebuttal time. Keep your eye on the clock. Thank you, Your Honor. A worldwide injunction at issue here, issued by the district court at the behest of a party with no property interest at stake, improperly invades the authority granted by Congress No property interest? No property interest, Your Honor. It's undisputed on this record that Shell does not own any of the boats, and in order to Somebody who rents an apartment has no property interest? That's a leasehold interest. That's a property interest. What Shell has here is a contract, an exclusive contract that comes with a skipper and a crew, and it was undisputed on this record that Shell does not navigate. That came up repeatedly throughout the proceedings. Well, they have a property interest in the oil lease, right? They have a property interest in the oil lease, Your Honor, but notice how odd their private nuisance claim is. It's as if I didn't like how my neighbor was landscaping their yard, and so I jumped up onto a landscaping truck that does not belong to my neighbor, and I protested, and would anyone say that I had interfered with my neighbor's right to use of their property, particularly when the property is thousands of miles away? This is an unprecedented kind of a private nuisance claim that no one has ever Let's assume for a moment you're right about the nuisance count, but isn't it a reality that virtually every oil company and every natural gas company in the world transports most of its product or crew, as the case may be, around the world in massive ships that are not owned by or piloted by the oil companies themselves? Is it Greenpeace's position that none of those people have, in effect, standing, have any interest in the vessels or their cargoes that is protectable under law? Your Honor, the law of torts has developed a special doctrine to deal with that. It's called tortious interference with contract, and in order to pursue a trespass claim, you have to have a property interest or you have to have possession. So do I understand, then, that you agree with the intimation of Nautilus Marine, Inc. versus Nimala, that that is an exception to the normal rule in admiralty law, and that if it's an intentional tort, that that is a proper tort to cover this kind of a situation? Tortious interference with contract? Yes. If they could prove it. We don't think they could prove it. No, I get that. I didn't expect you were going to advocate it for them, but the reality is that that particular tort, were it pled and were it proven, and I realize you don't agree that it can be, but that one would fly, would it not, to cover the matters that you are concerned about here? It would make sense. All of Shell's interests here are contract interests, and of course, it's basic law that contract interests and property interests are not the same. And in fact, if you look at some of Shell's own cases, they contradict what they're saying. The McLeod versus Quest case was a case they cited to suggest that they have a proper interest to support the trespass claim, but in that case, the court actually held that there was no, there was a property interest in Quest's telecommunications network, and they said, we're not just basing this on contract simpliciter. All right. The district court based a preliminary injunction, I don't know how many, I don't remember, causes of action I pleaded in the complaint, but on three, based it on three claims, right? Yes, Judge. Is that right? Yes, Judge. Initially one, but later two. What was that again? Initially, there was only one. I know, but on the, I forgot, on the stay order or something like that, right? Right. The suicide stay order, after we filed our brief. Okay. Right. So, what are those three again? So trespass was the one originally, and then interference with maritime navigation and private nuisance. All right. Now, is it your position that all three of those require Shell to have some kind of a possessory or a property interest? Well, the first and the third do. The interference with maritime navigation requires them to navigate, and I asked Shell's team, and I'm hearing repeatedly about navigation, and they conceded that they don't navigate. In fact, at pages, supplemental excerpts of record 199 to 200, which is not cited in our briefs, there was an interesting colloquy when I talked to Shell witness Michael Battle, and I said, what would happen if one of these rigid hull inflatable boats, one of these little protest boats, were to zip right in front of one of these vessels? Would the skipper of the vessel call up Shell and say, what do we do? Should we take evasive maneuvers? And paraphrasing him, he said, of course not. They would take evasive maneuvers without contacting Shell. They don't navigate. It's undisputed on this record that Shell does not navigate any more than if I were to hire a courier to go across town to Santa Monica and pick up a package. I'm not driving. What does that prove? I mean, presumably, if you have an emergency on board, the skipper will do what's necessary. He won't call the owner of the vessel, right? You wouldn't expect, whoever the owner of the vessel is, you wouldn't expect to say, I have an emergency here, I've got something, and tell me how to navigate. What does this question and answer that you pose there prove? I think it answers two questions, Judge Kuczynski. First, do they have a claim that they can state upon which relief may be granted? If you're not the navigator, how can you, how can you... Well, no, no. You asked the question, you know, you're the skipper. What would you do if you had an emergency? I mean, you could have asked him, would you call the owner of the vessel? And he would have said, of course not. You know, a skipper in an emergency does what is necessary to deal with the emergency. That's why you have a skipper. Right. And Shell has... So, it wouldn't... I'm sorry? And Shell has not leased a bare boat. They've got an exclusive contract that comes with the skipper. No, but the answer you got, that they wouldn't call Shell, did you ask him whether he would call anybody? Well, yeah. He said the skipper would take, would decide for himself. Of course, the skipper is in charge of... What does it prove then? They wouldn't call Shell, they wouldn't call the President of the United States, they wouldn't call the owners of the vessel? What does that question and answer prove? If you were to have a claim, you can't have simply derivative harm, that's harm suffered in the first instance... You're not answering my question. What does... What point are you trying to make with this answer? Just pick one. Failure to state a claim and standing. No, no. What point, what logical point, what does it mean that they wouldn't call Shell? They're not navigating. Therefore they don't... They're not navigating, therefore they don't have... The skipper navigates. Right. Or the owner doesn't navigate. Let's say the owner is... Shell is not the skipper. Shell doesn't skipper these boats. Well, usually skipper is a person. Right. They're not... And the owner, whoever the owner is, and whoever has an ownership interest, doesn't skipper the boats. They have a person there, an employee, whose job it is to deal with these things. And these skippers and crew are employed by the contractors, not by Shell. But what does this thing about, would you call Shell oil, what point were you trying to make there? I was trying to say that they have both standing and a substantive claim for interference with navigation. But would the skipper call anybody in a situation like that? If he has an emergency, but he... No, because the skipper who works for the contractors is in charge of the boat. Would he call the contractor? He is the contractor. He's an employee of the contractor. Would he call the owner? No. No. What would you say that he'd call anybody? So what does the fact he doesn't call Shell prove? It proves who's in charge of the boat and who owns the interference with navigation claim. Your Honor, if I... You've completely lost me. Just completely lost me. I have no idea what point you're trying to make. Well, let me put it this way. If I were to... If you're an airline pilot, right? You're flying an airplane, you have an emergency, right? You're about to collide with another airplane or you have a drop in pressure. Do they call American Airlines and saying, what do I do? The guy in charge of the vessel deals with emergencies. He couldn't call anybody. So asking him, would you call American Airlines? Would you call Shell or would you call anybody else? The answer's always going to be no. The answer's going to be, I'm going to deal with the emergency because I'm in charge of the emergency. Well, let me put it to you this way. If I were to get in a taxi and go across town and someone were to interfere with the driving of the taxi... Yeah. Let's say somebody jumps in front of the... Somebody jumps in front of the taxi. You think the guy's going to turn behind and say, may I stop and go around the guy who's jumping in front of the taxi? No. The driver's going to do what he's going to do, right? That's who navigates and that's who has the claim. And the US... So your position is that the person who navigates has the claim, not even the owner of the vessel. The people who actually have title to the vessel wouldn't... It's the guy who can stop it and maneuver it... It's his employer, obviously. He works for his employer. But what does this call business have to do? Well, how does this prove anything? Car business? The call business. Well, I think it was an apt demonstration of who was in charge of the vessel. I think it's in charge... It was quite a clear admission and there were other... What answer would you have gotten, should you have gotten, to prove the opposite? You think they would have said, oh yes, we'd call Shell Oil? Your Honor, if we even put that piece of the record aside... Well, you raised it. I did. You made a big point out of it. I did. And it came... So I'd like to understand what point you were trying to make. Well, I think I've made it as best I can. With respect, Your Honor, I don't know what else to say other than the fact that if you're in a taxi and you're not driving it, that you don't have a claim for interference with driving. Let's, for a moment, can we put those first two aside and go to private nuisance? Tell me what your concern is about the private nuisance issue. Is it the scope? Is it the what? Our concern about the private nuisance is this extraordinary scope. Again, Shell has cited no cases to support this claim like its other claims. And the scope of it is extraordinarily broad. The idea that we're interfering with leases that are thousands of miles away... So you're... Forgive me. You're saying then, if what we were talking about was interference with its lease, Shell's lease, and it's a geographic area and so on. And if you interfere with that, you agree that a private nuisance tort may lie. Is that a correct statement? Again, not assuming proof, but just as a matter of legal analysis, that such a tort would lie. Is that correct? If someone were out there actually physically interfering with the seabed where they have their leases, absolutely. Absolutely. Or on the surface if they're trying to get to the seabed, how about that? That creates a jurisdictional problem under OXLA, because the high seas above the Outer Are you really disputing that the court has jurisdiction here? You've got a California-based defendant in your gut shell. There's diversity. There's diversity. You've got two U.S. citizens. There's diversity. There is diversity. Okay. So... There is diversity. That's really not an issue for purposes of what I'm talking about, is it? Well, there's an OXLA question there, but go ahead. I think not. Bottom line is, of the three that the district court dealt with, you agree that the private the fact that it was used to protect ships that are perhaps thousands of miles away from the lease property. Is that right? Well, that's right. And also, again, these are contractor ships. What if it's an oil platform? I'm sorry? What if it were an oil platform? Well, that would certainly cure the OXLA jurisdictional problem, and... We're talking nuisance. I'm sorry? We're talking nuisance. Right. Well, in terms of nuisance, I suppose it would be possible if you were out there at the platform doing something that would raise to the level of a certainly impending action, specific evidence as the U.S. Supreme Court... Well, you're talking about boarding. You were boarding ships here. Your client was boarding ships, so we, you know... There was one employee who boarded one ship, and the U.S. Supreme Court and this court have been clear. The Munns v. Kerry case, the Clapper... I'm sorry. So you were boarding ships. I mean, there's no doubt about it. There was one employee who boarded one ship, and one can... I'm sorry. Does that make it any less? Yes. Yes, it does, because the City of Los Angeles v. Lyons case says one chokehold is not enough to show that you're going to go out and do it again. And there's lots of cases like that. This court's decision just months ago in Munns v. Kerry... Let's get back to the platform. What if it were a platform? Let's say it's a leased platform. Yeah, it's potential that someone, if they were doing things different from what Greenpeace is doing, could interfere with a lease. But it's got to be an interfere with a lease on the seabed, not with the seas, not with the oceans above it. What's the difference between the vessel and the oil platform? One is clearly covered by OXLA and is related to the lease because it's attached to the seabed. The other is exempted from OXLA because it's a... Here we have ships. Without a nuisance. You keep slipping into OXLA. Right. Let's talk nuisance. You can't have a private nuisance claim on a mineral lease protected by OXLA unless OXLA applies. But just looking at state law nuisance law, if someone were doing something very different from what Greenpeace is doing, that could theoretically be a viable claim. But we're talking about thousands of miles away, and we're talking about no evidence that Greenpeace was going to be up there on the outer continental shelf whatsoever. I'm down to very little time. Unless the court wants me to stay up and answer further questions, I'd like to save at least some of my time for rebuttal, if I may. Okay. Thank you, Your Honors. Good morning, Your Honors. My name is Jeff Leppo. I represent the plaintiff appellees, Shell Offshore and Shell Gulf of Mexico. This appeal involves the same stop-shell direct action campaign by Greenpeace USA pursued against the same U.S. companies regarding exploration drilling on the same federally issued OCS lease in the Chukchi Sea. Counselor, can I just ask you this? In the record, I think it was Stolreave's partner sent a copy of the preliminary injunction to Greenpeace affiliates in various countries. I know Australia, the Netherlands, and so on. Is it Shell's position that those letters effectively put them on notice to bring them within the confines of the injunction, talking about those acting in concert with and so on? Is that your position? It is our position that Rule 65D provides that an injunction is effective against the officers and directors, employees of a party, and against parties acting in concert which have actual notice. And the district court held that in this instance, with the boarding and occupation of the Polar Pioneer, that Greenpeace USA was acting together with other Greenpeace entities. So like occurred in 2012, we did send, we as in Shell, Stolreave's, did send notice of the injunction to other Greenpeace entities. That is true, Your Honor. Shifting the subject for a second, your opposing counsel and the court were discussing the contours of private nuisance, and he actually brought up the tortious interference with business relationships. Let's just say hypothetically that I'm concerned about the scope of the nuisance issue. Clearly if you're within the confines of the lease, probably no difficulty, but ships are a long ways away. It's a stretch, whereas tortious interference is not a stretch. From your perspective, what latitude does the district court have to, if you will, switch torts if you went back to them and said, to the district court and said, like, you know, we want to switch the basis of our injunction. Is that something that's permissible under the rules? Is it proper under the rules? Well, I believe it's proper under the rules to amend a complaint at any time. I personally have been involved in amending complaints after a jury made a decision. And so there's a great deal of latitude in that regard, and of course it's from a common nucleus of operative facts, and if the facts are properly pled. So if the court were to say the scope of the injunction is a little too broad here, we're going to send this back to the district court, your view is that you would have the right, presumably with the permission of the district court, to amend and plead a tortious interference claim. That's correct, your honor. In this instance, we pled only three claims, your honor asked the question, the scope of the complaint. We pled only three claims, and the reason that we did that was those are the same three claims that were pled in 2012, in which the district court. The one thing different about this record from 212 is that Greenpeace has raised, not the defense, but the issue that Shell does not have an ownership or a possessory interest in any of the ships in this Arctic fleet, right? And you don't contest that, do you? We don't contest that we don't own them, that's correct. They are under contract. We do believe that we have a possessory interest in them. You know, there are all kinds of, from my vague recollection of maritime law, there are all kinds of ship, you know, charters, right? You can get a bare-bottom charter, and that makes you virtually an owner, I think. I mean, you get a long-term possessing interest, but was it, did you try to raise the, or was it an issue in district court that, you know, your contract interest was sufficient to rise to the level of giving you a possessory interest in the ships? Yes, your honor. And the district court addressed that issue and concluded that it was a sufficient possessory interest. She addressed it, Judge Gleeson addressed it in her motion, her order addressing the motion to dismiss, which is in the Supplemental Act Sub-Record. And we do, according to the restatement, second of torts, have a sufficient possessory interest. Possession goes to one who has physical control, which the cases hold may be actual or constructive. We've cited cases to your honors in our answering brief at page 30, footnote 13, that contractual rights in a chattel demonstrate constructive possession necessary to support a trespass to chattel claim. And we cited Ed and F Mann biofuels versus MV phase, F-A-S-E, it's a MV phase, it's a vessel. This is a district court. Where are you reading from? This is a case that we've cited, your honor, it's 728 F sub 2nd, 862, at page 8, at 870. What's the name of the case? Ed and F Mann biofuels versus MV phase, F-A-S-E, it's a southern district of Texas, district court decision from 2010. At page 877, note 11, the opinion of the court there states, quote, a person is in possession of a chattel if he has control of it and intent to exercise such control. And then it goes on to say, the possessor need not have immediate physical control if someone else is exercising that physical control on its behalf. And that's our point here, that the existence of, the fact that these are under contract is really entirely a red herring. As the evidence demonstrated in the case and as the district court held, Shell sets the mission of these vessels, it tells them what to do, where to go, when to do it, it informs them on how to replenish their supplies, and it is in day-to-day control of these vessels. And it was on that basis that the district court held that there was a sufficient possessory interest. I think it's a constructive possession. What page were you reading from? From the opinion? From page 877, note 11. There's a lengthy footnote there. Forgive me, counsel, what was the site on that case again, please? It's 728 F. Sup. 2nd, 862, Southern District of Texas, 2010. That's a district court case? It is a district court case, your honor. And there are not a ton of cases dealing with trespass to chattels. Long footnotes. It's a very long footnote. The actual money quote is actually from... From a Texas court case. From a Texas case. Speaking to the restatement second of torts, however. Yarbrough v. John Deere in this case, right? That's correct, your honor. It's a quote from... It is. It's a quote within a quote. Texas Supreme Court? No, Texas Court of Appeals. Yeah. 75. Very good year. The trespass to chattel claims, there have not been a ton of cases, and accordingly, there are not a lot of cases to cite, too. But they're all still good law. And I think that the point being made there is a persuasive one. That constructive possession, when you have someone else exercising your rights of possession, are adequate for purposes, certainly vis-a-vis a trespasser, an intermeddler, which is clearly what Greenpeace USA was in this particular instance. The same thing applies to the interference with navigation claim, again. Here, Shell has constructive possession of these vessels, and it's interfering with... Greenpeace's actions are interfering with Shell. It's a particularly odd point, and maybe it's just a practical point. The very reason that we're here is that Greenpeace USA is engaging and threatening torts to stop Shell. The reason that they boarded the Polar Pioneer, the reason that they engage in interference with navigation, is in order to stop Shell. They refer to this as Shell's oil rig, the Polar Pioneer. That's a supplemental excerpt of record 397 to 399. And so it would be an odd circumstance that they are engaged in a stop Shell campaign, doing these things to stop Shell, but somehow Shell doesn't have a sufficient possessory interest in them. Certainly, they must think they do. And speaking to the nuisance claim, Your Honor, I think that really the nut of this case is a nuisance claim. The point of the stop Shell campaign, and all the actions that flow from it, are to keep Shell from getting to and enjoying the substantial rights that it has in its lease on the OCS. And so I agree with you that there are not a lot of cases, I mean most nuisance cases arise on the land. This is a situation, there is land, but it's underneath the ocean. It's an odd circumstance, I would agree with that. And yet, the circumstances here are that Greenpeace USA is engaging in torturous behavior to stop Shell from getting to its leases, to keep its assets from getting there so that it can engage in exploration. And that's precisely the concept of nuisance. Really, nuisance is the claim that best fits the conduct. I guess what I'm troubled by, and if you look at the actual restatement, it talks about, defines private nuisance as a non-trespassory invasion of another's interest in the private use and enjoyment of land. I realize there's some case law that suggests that's a little more elastic, but I'm just that for purposes of the restatement that the interest that Shell has in these ships moving along is sufficient to qualify. There's no question in my mind, anyway, that once you get to the leased property, no question. But I'm just troubled by the idea that you have a private nuisance, at least as defined by the restatement, in these ships moving along. That's why the torsus interference seems to fit very easily, and it is clearly, at least by our case law, it seems to fit in admiralty law, whereas private nuisance, not so clear. That's the reason why I bring that up, is I just, can you cite me a case wherein private nuisance has been applied in admiralty? I cannot, Your Honor. I can't find it either. No. So that's why I'm saying, and Frank- Again, I think these circumstances are very unusual, and that one would not expect this to arise in very few, if any, occasions. And there is an interest in the subsurface, and there are cases which we've cited to the court about how nuisance can be trying to prevent somebody to get to their property so they can use and enjoy it, and that's what's occurring here. These vessels are essential to shells' ability to use and enjoy the land that it possesses through its leaks. I hear you. Again, my concern is, we're talking about an admiralty situation here. Can you address the Nautilus Marine case and what role, if any, that might play were you to plead torsus interference? So does that open up the possibility of using such a tort in admiralty? It doesn't say you can, but it's just an intimation. Can you address that issue, please? Honestly, Your Honor, I'm not familiar as I stand here with the Nautilus case. I can tell the court that in 2012, we pled a cause of action for tortuous interference, and under the facts of those circumstances, the district court concluded that, and this had been trespassed upon by Greenpeace International or others, she dismissed the claim. And so the principle reason we didn't bring it was we had three claims which we thought were completely valid, and that was a claim which the court, albeit under different circumstances, had concluded wasn't properly stated. But at that time, we did provide the court, and there is authority, although I cannot dredge it up for you at this moment, supporting a tortuous interference of contract claim in admiralty. Okay. Thank you. Wait a minute. Can I ask you one question? Of course. There's a provision in the preliminary injunction that addresses drones. I mean, where did that come from? And did you argue that? Yes. And what was the evidence on which you based that request for the drone provision? Right. So, the evidence appears in the declaration of Mr. Lee, which is at Supplemental— That's the one that says he read about it in the newspaper? That's correct, Your Honor. So, the circumstance was that Greenpeace USA has indicated publicly that they have a drone and that they intended to use it in the Arctic. And preliminary injunctions are a sliding scale, and I'd be the first to acknowledge that this is a situation where the risk of irreparable harm is enormous. The greatest risk to human life in the Arctic is in the transport of folks by helicopter from the coast back, and they're going back and forth all the time. They're dropping out of the clouds, and Mr. Lee testified to this at some length. And so, the potential for a problem associated with a drone in the area, one that is unmarked, that hasn't been coordinated with anyone else, would lead to fatalities. So, we had information indicating that they have a drone. We also know that Greenpeace is quite creative and that their tactics evolve, putting people, human bucklades, hanging from bridges, you know, kayaks. It's all—they're a creative organization, and they evolve as tactics evolve as well. And so, there was a great deal of concern about the possibility of an unmanned drone that would not be seen and would drop on that basis, I think, using the sliding scale and acknowledging it's not as strong as the vessel issues, certainly. What was the basis of the geographic area that's covered by the drone probation? It's in Mr. Lee's declaration, Your Honor, because there need— what, in fact, the preliminary injunction says as to drones is that the use of drones are prohibited in the area, but that Greenpeace may come to the court and was invited to come to the court and put forward a plan for operating drones that would be coordinated rather than uncoordinated. And so, they had the ability to do that. They haven't done that. Thank you. Thank you. Thank you, Your Honor. We'll give you a minute for rebuttal. I think you have half a minute left. We'll make it a minute. Thank you very much, Your Honor. On the Ed and F Mann biofuels case, that's an exact example of why Shell has no trespass claim here. The Ed and F Mann biofuels case is a case where a bank held a mortgage in Lian on a ship owner and they defaulted, and so the ownership interest went to the bank. Shell's not like that. And you can go through every one of Shell's cases where they try to show that a contract gives them a sufficient possessory interest, and there's circumstances like that. There's a case from the Kansas Supreme Court from 1973 where someone had signed a purchase and sale agreement on a piece of property that was damaged before the closing occurred, and the Kansas Supreme Court said this is colorable title. They don't have colorable title. They're not about to take over the ownership of these boats in any fashion, not like Ed Mann biofuels, not like the Quest communication case. This is not like the Kansas case they cited. None of their cases support any kind of a possessory or property interest. We'd also point out, Your Honors, that the burden was on them. They never put the contracts in evidence, and as you pointed out, Judge Tashima, there's lots of different kinds of admiralty contracts, bareboat contracts, et cetera, and they never put them into evidence. On the issue of drones, Judge Tashima, my very clear memory of the evidence was that Greenpeace had a balloon on a string that said something like, Stop Shell, and they were holding it up in an urban area and talking to drivers who went by. That was the evidence of drones. It was not anything that was happening out on the high seas or what you would normally think of as a drone. Are you able to represent that Shell would not use a drone in connection with its operations against Shell? Greenpeace would not use a drone. I assume you're representing Greenpeace. I'm not in a position to represent what my client will or will not do in the future. I would be very surprised if that happened, but I'm afraid I couldn't answer that question. We won't let you drone on. Can you represent that they don't have a drone now? I beg your pardon? Can you represent that they don't have a drone now? I don't know what they have and they don't have. I don't believe they do, but I'm not a witness and I don't know. But the evidence that was in the record at the time that I recall was someone who was holding a balloon that said something like, Stop Shell, no drilling in the Arctic. Classic First Amendment political speech. And they were talking to drivers who saw it as the drivers went by. If it doesn't have a drone, then it's really not impacted by that part of the injunction, is it? Well, I don't think Americans ever want their rights to be burdened just because the government thinks of something that they might do. And that really goes to the heart of what this case is all about. The judge said that the injunction was narrowly tailored because we could always go back to the judge and ask for exceptions to it. But that really turns the Bill of Rights upside down, Your Honors. The First Amendment doesn't require Americans to go to the government, hat in hand, and say, Could you make an exception to this rule where I want to exercise my constitutional and civil rights? And this injunction really does burden rights. The evidence was undisputed that these one-kilometer safety zones, as Mary Sweeters testified from Greenpeace USA, make their work, quote, close to impossible. And they want to go out there, and the testimony was undisputed, and get up close to the ships and take photographs for core political purposes of transmitting these images to the American people so that they will take action, political action. You can get pretty good pictures from satellites. I bet you they can get cameras that will take a pretty good picture from a kilometer. A kilometer is not that far away. Well, the evidence in this case... It's 600 yards. The evidence in this case was undisputed that it would make Greenpeace's work close to impossible. They create these iconic images, as they did with the Save the Whales campaign, where they get right up close to the ships, and that those iconic images define who Greenpeace is and have motivated in the past the American people. You know, I find that interesting. I just read a National Geographic magazine yesterday, and there were some pictures of animals that were so close that were taken from well over 1,000 yards away with modern equipment. How can you say that they could not take pictures to make the representation that you want under the First Amendment because they were 600... Because it's not that the photograph, the photography equipment, will reach Judge Smith. It's that there's nobody in the foreground holding the Greenpeace banner saying, this is wrong. Oh, I see. Okay. That's the boarding part. No, it's the being next to. And Mary Sweeter's testimony on this was very clear, and it's cited in our brief. And, you know... It's always Photoshopped. Well, but that's not protesting. I mean, obviously you could Photoshop, but that would be kind of faking out their support. That would be shocking if anyone would do such a thing. Yes, it would. Thank you very much, Your Honors. Why don't you put it on what we used to call a gummed label. Do we still have those?  Supplemental excerpts of Record 350. Okay. SCR 350. Is that what he said? That's a quote from basically how we're on the old ground. He said, Dan Howells, Greenpeace USA's Deputy Campaign Specialist. Quote, the idea that we get ourselves in the position we got. Again, I'm not representing that this is wrong. Okay. Thank you. The case is argued. We stand submitted.
judges: Kozinski, Tashima, Smith